R. S. Hogue v. A. J. Baker, Commissioner of the General Land
Office.

No. 640.   Decided May 23, 1898.

### 1.   Mandamus—Other Remedy—Refusal to File Field Notes.

The right of a claimant of a homestead donation to have his field notes filed in
the General Land Office, thus preserving in that office evidence of the settler's rights,
is a valuable privilege, which, in a proper case, may be enforced by mandamus,
though not essential to his title because the refusal of the Commissioner to receive
and file them would not destroy it. (P. 61.)

### 2.   Constitution—School Land, How Segregated.

Section 2, article 7, of the Constitution, in making one-half of the public domain
a part of the school fund, left the mode of partition, except as to alternate certificates
granted to corporations, etc., wholly to legislative control, and did not contemplate
a division as a whole.   The segregation could be accomplished by successive divisions
in part, or by sales of parcels successively and division of the proceeds, as in the
Act of July 14, 1879, for sale of public lands. (Pp. 61-64.)

### 3.   Same—Disposition of Public Lands—Compensating School Fund.

Where affirmative action was taken by the Legislature for such segregation pro
tanto of the interest of the school fund, its action is final.   But where appropriations
were permitted without making such provision, as in case of veteran certificates
and those revived by the Constitution, the school fund should be compensated for
the lands appropriated thereby by retaining a corresponding interest in the remain-
ing portion of the public domain. (P. 64.)

### 4.   Same—Exhausting Lands Subject to Location.

The half of the public domain having been taken up by locations for which no
corresponding allotment was made to the school fund, the remainder became a part
of that fund, and was not subject to entry by a homestead pre-emption claimant.
(Pp. 64, 65.)

### 5.   Case Explained.

Ruling in case of Railway v. State, 77 Texas, 367, explained and approved. (P. 62.)

Original application to Supreme Court for mandamus to the Com-
missioner of the General Land Office.

*E. T. Moore, D. W. Doom, V. C. Moore,* and *D. H. Doom,* for plain-
tiff.—The land upon which plaintiff has settled, made application for,
and had surveyed, was a part of the public domain prior to the Special
Act of the Legislature passed May 2, 1873, and that reservation having
lapsed by its own terms, the land was subject to be settled upon, applied
for, and surveyed as a homestead donation on the 19th day of October,
A. D. 1897.   Const. 1869, art. 10, sec. 8; Act May 2, 1873, Special Laws,
p. 318; Const. 1876, art. 14, sec. 6; Rev. Stats., 1879, chap. 9, arts. 3937-
3951; Rev. Stats., 1895, chap. 8, arts. 4160-4174; Act July 14, 1879,
Special Session, p. 48; Act March 11, 1881, p. 24; Act January 22, 1883,
p. 2; Act Feb. 3, 1883, p. 4; Act March 31, 1885, p. 104; Rev. Stats.,
1895, art. 4198; Act March 29, 1887, p. 61; Act April 5, 1889, p. 48;
Act June 18, 1897, Special Session, pp. 19, 20; Act April 24, 1879, p.
160; Act April 29, 1895, p. 149; Cattle Co. v. Bacon, 79 Texas, 5; Bacon
v. State, 2 Texas Civ. App., 692; Railway v. State, 77 Texas, 367.

In a motion for rehearing, which was overruled, counsel for applicant
contended:

1. The court erred in deciding in its opinion that the public domain of the State in existence at the time of plaintiff's settlement, application, and survey for a homestead donation was not subject to location by plaintiff as a homestead donation, the land upon which plaintiff located not having been set apart by the Legislature of the State of Texas, or appropriated by it to the public schools; said decision being contrary to the decision of this court in the case of the Galveston, Harrisburg & San Antonio Railway Company v. The State, 77 Texas, 367; that decision having been made in the year 1890, having become a rule of property upon which plaintiff and all other persons have acted, and on the faith of which plaintiff made his settlement and application for survey, and that decision should have been followed by this court under the rule of stare decisis. Willis v. Owen, 43 Texas, 48.

2. The court erred in refusing to grant the mandamus prayed for by plaintiff, because article 14, section 6, of the Constitution of the State provides, that to every head of a family without a homestead there shall be donated 160 acres of public land, upon condition that he will select and locate said land and occupy the same three years and pay the office fees due thereon; and plaintiff having complied with said provision of the Constitution and complied with the condition by selecting and locating upon 160 acres of land and entered into occupancy of the same, and had his field notes returned to the defendant, as Commissioner of the General Land Office, and tendered all of the office fees due thereon, had complied with the terms of said provision of the Constitution as far as it was within his power to do so, and the said land upon which he had his location being public domain of the State of Texas, and not having been set apart or appropriated by the Legislature of the State of Texas for a perpetual school fund, a contract had arisen under the terms of said provision of the Constitution between plaintiff and the State of Texas, so that any action on the part of the State, or any authority under it, against plaintiff's right to said land impairs the obligation of said contract and is in violation of the Constitution of the United States. Wells v. Davis, 77 Texas, 636; Const. U. S., art. 1, sec. 10; Fletcher v. Peck, 6 Cranch, 87; Terrett v. Taylor, 9 Cranch, 43; Davis v. Gray, 16 Wall., 203.

*M. M. Crane, Attorney-General,* and *T. A. Fuller, Assistant,* for respondent.—By the Act of 1873 the land embraced within the Texas & Pacific reservation became reserved from the public domain, and the Constitution and laws authorize homestead locations only upon vacant and unappropriated public land, and therefore plaintiff can not prevail. Const., art. 14, sec. 6; Rev. Stats., art. 4160; Land and Cattle Co. v. State, 68 Texas, 528; Railway v. United States, 92 U. S., 733; Newhall v. Sanger, 92 U. S., 761.

The Act of 1873, setting apart the Texas & Pacific reservation, was a grant of one-half of the lands therein embraced to the free school fund of the State of Texas, and the constitutional provision of 1876 setting

apart and appropriating for the support of the public schools all lands theretofore set apart and appropriated for that purpose, and all of the alternate sections of land reserved by the State out of grants theretofore made to railroads, confirmed and made absolute said grant and reservation made by the Act of 1873 for the benefit of the public free schools.   Special Laws, 1856, p. 80; Special Laws 1873, p. 318; Const., art. 7, sec. 2; Davis v. Gray, 16 Wall., 216; Pengra v. Munz, 29 Fed. Rep., 830; Railway v. United States, 92 U. S., 733; Denny v. Dodson, 32 Fed. Rep., 899; Swann v. Lamore, 14 Am. and Eng. Ry. Cases, 519.

The Act of 1873 and the Constitution, construed together, have the effect to vest in the permanent school fund all lands embraced within said reservation not taken up by the railway company with its locations, and the land in controversy being lands not earned by said railway company, became  wholly the property of the permanent school fund.

The land in this reservation belongs to the school fund under the clause of the Constitution granting one-half of the public domain to the perpetual school fund.   Land and Cattle Co. v. State, 68 Texas, 542; Railway v. State, 77 Texas, 367; Cattle Co. v. Bacon, 79 Texas, 5.

*Johnson & Edrington* and *Henry Sayles* filed a citation of authorities on behalf of purchasers from the Houston & Texas Central Railway Company prior to a release of the rights of the State.

GAINES, CHIEF JUSTICE.—This is an original application to this court for a writ of mandamus to compel the Commissioner of the General Land Office to receive and file the field notes of a survey made on behalf of the relator for acquiring a homestead donation under chapter 8, of title 87, of the Revised Statutes.   The relator alleges in substance, that he had settled upon a tract of 160 acres of land in Scurry County for the purpose of acquiring a homestead; that it was unappropriated public domain; that he had made the required application and affidavit and caused the land to be surveyed and had returned the field notes of the survey duly certified to the General Land Office; but that the Commissioner had refused to receive and file them.

The respondent demurred to the petition, and also answered, alleging in substance that the land in controversy was a part of the public domain, reserved by the Special Act of the Legislature entitled "An Act to adjust and define the rights of the Texas & Pacific Railway Company within the State of Texas, in order to encourage a speedy construction of said railway through the State to the Pacific Ocean," passed May 2, 1873, and that by virtue of that act and of section 2 of article 7 of the Constitution, it was not subject to appropriation as a homestead donation; and also that of the public domain existing at the time the Constitution of 1876 went into effect largely more than one-half had been taken up on certificates and by settlers as homestead donations and had been otherwise disposed of by the Legislature for various purposes other than for the benefit of the general free school fund of the State, and that by virtue of

the section of the Constitution above cited all the remaining unappropriated public domain of right belonged to that fund.

The petitioner demurred to the answer and also filed a general denial. But upon the hearing, by agreement between the parties, the case was submitted for final determination upon the demurrer to the petition and answer. We understand by the agreement that we are to dispose of the case as if the facts alleged in the answer were formally admitted to be true.

The first question which present itself is as to the remedy which is sought in this case. It is urged in behalf of respondent, that, even if the relator is entitled to have his field notes filed, resort can not be had to the writ of mandamus. But we are of the opinion that this contention can not be maintained. It is true that ordinarily the writ of mandamus must be the last resort; and it will not be allowed if there be another remedy which is adequate and complete. It must be reasonably necessary to the enforcement or establishment of the right which is sought to be secured. Building and Loan Asociation v. Maddern, 44 S. W. Rep., 823. In the chapter of the Revised Statutes which provides the method by which a homestead donation may be acquired it is prescribed that 'the field notes of every survey made under the provisions of this chapter, after being duly certified, mapped and recorded, shall be returned to and filed in the General Land Office within twelve months after the date of the survey aforesaid." Rev. Stats., art. 4166. It may be that when the settler has returned his field notes in accordance with the requirements of this article, the failure of the Commissioner to accept and file them until after the lapse of the twelve months would not destroy his inchoate title. But it seems to us that the purpose of the statute is twofold—one to acquaint the commissioner with the fact that the necessary steps have been taken to appropriate the land, so that it may be designated upon the maps in his office as segregated from the public domain; and the other to preserve in that office the evidence of the settler's right. When filed in the General Land Office the field notes with the plat and certificate become archives of that office, and under our statutes a certified copy thereof may be used as evidence in all the courts. It furnishes a convenient method of proving not only that the survey has been made, but also that the field notes have been returned to the Land Office in the time prescribed by law. It follows, that the right to have the field notes filed in the General Land Office is a valuable privilege, and one which in our opinion should in a proper case be enforced by the writ of mandamus.

This brings us to the main question in the case. Was the land which was settled upon and surveyed subject to appropriation as a homestead donation? In the view we take of the case we find it unnecessary to determine whether or not the fact that it was a part of the Texas & Pacific Railway reservation affects the question. It being an admitted fact that largely more than one-half of the public domain as it existed at the time our present Constitution took effect has been set apart and otherwise dis-

posed of for purposes other than for the benefit of the general school fund, it is insisted on behalf of the respondent that the remainder is no longer subject to settlement under our laws which provide for homestead donations. On the other hand, the relator's contention is, in substance, that since the Constitution not only declared that one-half of the public lands of the State should constitute a part of the school fund but at the same time provided that a homestead should be given to such actual settlers upon the public domain as owned no homestead, such settlers have a right under the law to locate upon any of the unappropriated public domain so long as any part thereof remains which has not been expressly set apart by the Legislature for the benefit of the public schools. In support of this position counsel rely upon the decision of this court in the case of the Galveston, Harrisburg & San Antonio Railway Company v. The State, 77 Texas, 367. Although there may be expressions in the opinion in that case which, considered without reference to the question before the court, may seem to support the position of counsel, the decision of the point here made was not necessary to a determination of the question there under consideration. There, certificates for land had been issued to the railroad company after the Constitution went into effect; they had been located and surveyed in alternate sections as required by law, and one of the two surveys made by virtue of each certificate had been set apart to the school fund and the other to the company. The purpose of the suit was to recover for the school fund an undivided half of the surveys which had been set apart to the company. The contention of the Attorney General in that case is thus stated in the opinion of the court: "It is contended by appellee 'that by the Constitution of 1876 there was unconditionally appropriated to the public free schools an undivided one-half of the unappropriated public domain within the State at the time said Constitution was adopted, in addition to such alternate surveys as should thereafter be reserved from grants to corporations.' It is insisted that the expression 'one-half of the public domain' must be given all the force that the words imply, unrestrained and unmodified by what precedes them in the same section or by what is found in other articles of the Constitution. It is insisted that that clause in the Constitution is self-executing and had the immediate effect of appropriating to the school fund an undivided half of the then unappropriated public domain that was not otherwise appropriated by other provisions of the same Constitution." And again the court say: "The Attorney-General in his argument filed in this court says: 'As "one-half" of the public domain was unconditionally appropriated to the schools, appellant's title to any of the land might be seriously questioned, for its surveys were made with notice that no partition had ever been made so as to give the school fund its part, and that therefore none of the lands it located were in fact or in law *unappropriated*. If the State is content, the appellant certainly ought to be." These extracts clearly show the question which was involved in that case, and the propositions which the court was called upon to consider. In answering the contention made in

HOGUE v. BAKER. 63

behalf of the State, the court announced the proposition that section 2, article 7, of the Constitution, in so far as it made one-half of the public domain a part of the public school fund, was not self-executing, and that it was not intended that there should be a partition in gross between the State and the school fund before any lands were subject to be located by virtue of certificates issued or to be issued, or by settlers for the purpose of acquiring homesteads. In the propositions, that the manner of segregating the interest of the school fund in the lands was left to the Legislature,—in other words, that the provision which made a half of the public domain a part of the public school fund, was not fully self-executing, and that the Legislature was nbt bound to make a partition before any part of the public lands could be appropriated,—we fully concur. Neither do we see any reason to doubt the correctness of the court's conclusion upon the question involved in that case.

Let us recur then to the constitutional provision which we are called upon to construe. The section of the Constitution under consideration reads as follows: "All funds, lands, and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads, or other corporations, of any nature whatsoever; one-half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual public school fund." Const., art. 7, sec. 2. The plain purpose of the section is to declare what shall be the school fund. Lands theretofore set apart to that fund are preserved to it, and it is further declared that one half the public domain shall constitute a part of the constitutional dedication. In our opinion, it fixed the right of the school fund in one-half of the unappropriated public domain, but left the Legislature, as we have previously intimated, with extended authority over the segregation of that interest by partition of the lands or of their proceeds. It gave to the school fund the right to an equitable half of the public domain, and in so far the provision executed itself. The mode of partition or of the segregation of that half, except as to alternate certificates granted to railroad companies and other corporations, was left wholly to legislative control; and it seems to us that, if the Legislature had made a partition or provided a mode of segregation, its action would have been conclusive. We see no good reason why value should not have been the guide in making a division, and since this involved the determination of a question of fact, its action could hardly be the subject of review by the courts, unless perchance it should appear obviously and grossly inequitable. The fact that it was provided that by virtue of every certificate granted to railroad or other corporations two sections of land should be surveyed, one of which should be set apart to the schools, evinces that a division as a whole was not contemplated. The segregation could be accomplished by successive divisions in part or by sales of parcels successively and a division of the proceeds. In many of the acts which were passed.

after the Constitution went into effect and which authorized the appropriation of the public domain, provision was made for a division pro tanto. This was the case as to grants to railroad companies and other corporations—as was clearly required by the mandate of the section in question. It was also the case as to the act which granted certificates for land to disabled confederate soldiers. The Act of July 14, 1879, which authorized a sale of the unappropriated lands in certain counties of the State, directed that the proceeds of the sales made thereunder should be applied one-half to the school fund and the other half to the payment of the public debt. It was not so however with respect to the veteran certificates which were authorized to be issued by the Act of April 26, 1876. Nor has the Legislature at any time undertaken to make compensation to the school fund for the lands appropriated by virtue of the outstanding certificates, which were revived by the Constitution, or those appropriated to the other special objects provided for in that instrument—such as the lands for building the capitol and those taken up by settlers as homestead donations.

It follows from what has been said, that in our opinion, where the Legislature has taken affirmative action and has provided pro tanto for the segregation of the interest of the school fund, its action is final. But we do not think that the same can be said as to such appropriations as were passively permitted without making such provision. In view of the plain mandate of the Constitution, which declared one-half of the public domain a part of the school fund, we can not think that it intended, at least as to the veteran certificates and those revived by the Constitution itself, that the school fund should not be compensated for the lands that should be appropriated thereby from that portion of the public domain which should remain after such appropriation. It his never been understood, that in granting a land certificate the State warrants that there is public land to which it may be applied. When the public domain is exhausted by other certificates or for other purposes, a certficate becomes practically a nullity. Therefore, it seems that the idea upon which the Legislature has proceeded in granting the veteran certificates, and in failing to provide any method by which the school fund should get a corresponding part of the public lands upon the location of those and other certificates of a like character and upon settler's locations, was that upon each appropriation the school fund's interest should remain in the unappropriated and undivided part, so that upon each appropriation of the character under consideration, the quantity to which the school fund was entitled in the remainder continued precisely the same as it was before such appropriation. If we are not mistaken in our conclusions, it results that when the Legislature has permitted the appropriation of one-half of the undivided public domain without setting apart to the school fund its half, the remaining half belongs equitably to that fund.

We do not concur in the proposition, that because the Constitution

gave the right to persons without homesteads to acquire by settlement a homestead donation, that the right continues so long as any part of the public domain remained not specifically set apart to the school fund and not otherwise appropriated. The right of acquiring land as a homestead donation was necessarily limited. The lands upon which the right was to be exercised were not inexhaustible; and upon the exhaustion of the lands subject to such appropriation, the right of necessity ceased. It could not have been intended that the half of the public lands, which were made a part of the school fund, should be subordinate and subject to the right of homestead donation. To hold that the homesteads must be first taken out and that one-half of the remainder should then belong to the school fund, would be practically to rule that the school fund should take nothing and would make the plain and emphatic language of section 2 of article 7 an empty declaration. Since there will always be persons without homesteads, the result of that holding would be that all the unappropriated lands should be held for that purpose. In our opinion, it is therefore clear that one-half of the public domain, without reference to the right of acquiring homestead donations, was made a part of the school fund, and that when the other half was exhausted the right of such acquisition ceased.

We have not found it necessary to determine whether it was the intention to appropriate one-half of the whole of the public domain, as it existed at the time the Constitution went into effect, or whether it was the half of what should remain after setting apart the 3,050,000 acres for building the capitol and the 1,000,000 for the support of the university, as provided for in the Constitution itself, that was appropriated. If the school fund was entitled to only a half of the remainder after subtracting these lands, still according to the statements made and the figures exhibited in the answer of the respondent there is not enough of the public lands left unappropriated to make good to the school fund its half either in quantity or value. We are of the opinion, that as to the certificates which were revived by the Constitution it was not the purpose to give them any preference over the school fund, or to permit them to be located at its expense. The lands located by virtue of these certificates, as we think, were to be taken out of the half which the State retained. When the Constitution took effect, the public lands amounted approximately to 75,000,000 of acres, and it is to be presumed that this fact was known to the convention which framed that instrument. One-half of this quantity was more than sufficient to satisfy the outstanding certificates, to encourage the construction of railroads and other internal improvements and to meet every demand made upon them by the Constitution or by the Legislature under its authority.

Having reached the conclusion that the half of the public domain not dedicated to the school fund has already been exhausted, and that what remains belongs equitably to that fund, it follows that the survey

in controversy is not subject to location for the purpose of acquiring a homestead donation.

The writ of mandamus is therefore refused.

*Mandamus refused.*