United States Court of Appeals,

Fifth Circuit.

Nos. 94-50369, 94-50541.

The TONKAWA TRIBE OF OKLAHOMA, in its sovereign capacity and as a representative of its members, Plaintiff-Appellee,

v.

Ann RICHARDS, individually, George W. Bush, Jr., in his official capacity as the Governor of the State of Texas, Garry Mauro, individually and in his official capacity as Land Commissioner of the State of Texas, and the State of Texas, Defendants-Appellants.

The TONKAWA TRIBE OF OKLAHOMA, in its sovereign capacity and as a representative of its members, Plaintiff-Appellant, Cross Appellee,

v.

Ann RICHARDS, individually, George W. Bush, Jr., in his official capacity as the Governor of the State of Texas, Garry Mauro, individually and in his official capacity as Land Commissioner of the State of Texas, and the State of Texas, Defendants-Appellees, Cross-Appellants.

Oct. 23, 1995.

Appeals from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, JONES and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Appellant, the Tonkawa Tribe of Oklahoma ("the Tribe" or "the Tonkawas") brought suit against the State of Texas, its Governor and Land Commissioner ("the State") to compel the State to donate unspecified Texas lands to the Tribe for use as a homeland, and seeking damages on the basis of an 1866 Act of the Texas Legislature. The district court granted summary judgment for the State. We affirm.

FACTS

Prior to the Spanish colonization of Texas, the Tonkawas lived in what later became central Texas.  During the Indian Wars, the Tonkawas served as scouts and fought alongside the Texans against other Indian tribes.  In 1859, the Tonkawas were removed from Texas to an Indian reservation in Oklahoma.  On March 2, 1861, Texas seceded from the Union and joined the Confederacy.  Despite their removal to Oklahoma, the Tonkawas remained loyal to Texas.  In 1862, the Tonkawas learned of plans for an Indian raid on Texas and forewarned the Texans.  Because of this act of loyalty to the Texans, the Tonkawas were massacred by the Delaware, Shawnee, and Caddo tribes.  In the massacre, 137 of the 300 Tribe members and the Tribe's chief were killed.  In recognition of the Tribe's sacrifices, the Confederate Texas Legislature passed a Joint Resolution in 1864[1] to provide temporary support and land to the

---

[1] Joint Resolution in relation to the Tonkaway [sic] Indians

> Whereas, From the earliest settlement of Texas, and during the war of Texas Independence and border wars with other Indian Tribes, the Tonkaway [sic] Tribe of Indians have remained true and faithful, and have been the close and constant allies of our people;  and
>
> Whereas, At the earliest dawn of the present war, said tribe declared their destiny to be our destiny, and in consequence of their fidelity to the cause of Southern Independence they were attacked by our enemies and more than one-half of the tribe perished, including the brave old veteran Chief Placadore, who, with his warriors, women and children, proudly perished rather than betray or desert the cause which they had espoused;  and
>
> Whereas, The remnant of this faithful people are now wanderers on our soil, in the most wretched and dependent condition;  Therefore
>
> 1. Be it resolved, That the Governor take such

Tonkawas.

When the Civil War ended in 1865, Texas entered a period of Reconstruction that lasted through January 1874. By letter of September 20, 1866, Texas Governor J.W. Throckmorton appealed to the federal government to allow a Texas agent to care for the Tonkawas and advised the Commissioner of Indian Affairs that he intended to request support for the Tribe from the Provisional Texas Legislature. On November 1, 1866, the Provisional Texas Legislature passed an Act to Provide for the Tonkawa Indians ("1866 Act")[2] which included a section setting aside a league of land to

---

steps to settle them on the public domain of the State, and at such place as he may deem proper.

2. That the sum of thirty-five thousand dollars annually, for the years 1864 and 1865, be and the same is hereby appropriated out of any money in the Treasury, not otherwise set apart, for the support and maintenance of said tribe of Indians; the same to be expended under the direction of the Governor.

3. That these resolutions be in force from their passage.

Approved May 28, 1864, 10th Leg., C.S., ch. 3, 1864 Tex.Gen.Laws 42, *reprinted in* 5 H.P.N. GAMMEL, LAWS OF TEXAS 800 (1898).

[2] An Act to provide for the Tonkawa Indians

Sec. 1. Be it enacted by the Legislature of the State of Texas,

That the Governor shall appoint an agent for the Tonkawa Indians, whose duty it shall be, under the direction of the Governor, to locate and settle said Indians on the lands set apart for them by the provisions of this act, and who shall superintend and manage their affairs as the Governor shall direct, for which service said agent shall receive not more than five hundred dollars per annum, which amount is hereby appropriated, and may be paid quarterly, upon the

be used by the Tonkawas "as a home, as long as they shall live on the same." The Tonkawas have never resided on any land as provided for under the 1866 Act.

After the massacre of the Tonkawas by the Delaware, Shawnee and Caddo tribes, the Tonkawas returned to Texas, settling near Austin. In April 1867, the Tonkawas were moved to Jacksboro,

---

approval of the Governor.

Sec. 2. That there shall be set apart for the use of said Indians (Tonkawas), as a home, as long as they shall live on the same, one league of land, out of the unappropriated public domain of the State, to be selected on the line of the frontier, at such suitable place as the Governor may direct; Provided, the fee in said land so selected shall remain in the State, and shall not be subject to location or entry, as long as it is used for the purpose herein provided for, and when it shall cease to be so used, it shall not be disposed of except by act of the Legislature.

Sec. 3. That the sum of three thousand five hundred dollars, United States currency, or so much as may be necessary, is hereby appropriated, out of any unappropriated funds in the Treasury, which shall be expended under the direction of the Governor for the use and benefit of said Indians.

Sec. 4. That the Governor be required to apply to the authorities of the General Government, to take these Indians in charge and provide for them, and in the event the Government shall do so, then the appropriation of money herein made shall cease to be used.

Sec. 5. That the Governor is hereby authorized to furnish to the Tonkawa warriors, one gun each, if there be any belonging to the State on hand.

Sec. 6. That this Act take effect and be in force from and after its passage.

Approved Nov. 1, 1866, 11th Leg., R.S., ch. 78, 1866 Tex.Gen.Laws 73, *reprinted in* 5 H.P.N. GAMMEL, LAWS OF TEXAS 991 (1898).

4

Texas, where they were turned over to the care of Major Starr, the Federal Commandant at the Jacksboro post.

Later in 1867, the Tonkawas were settled near Fort Griffin, originally called Camp Wilson, in present-day Shackleford County. During the time the Tonkawas resided near Fort Griffin, they continued to serve as scouts for federal troops located at the Fort. In September of 1874, the Tonkawas fought beside federal troops against the Comanches in Palo Duro Canyon in the last major battle of the Indian Wars. The Tonkawas remained at Fort Griffin until 1884, at which time the Army left and the Tribe was once again removed to Oklahoma.

The Tonkawas were settled on a reservation of approximately 91,000 acres located near Ponca City, Oklahoma, in June of 1885. The Tribe's population continued to decline until there were fewer than fifty tribal members left. The reservation has since been decreased to 160 acres of land. The Tonkawas remain a small tribe, with approximately 15 families living on the reservation. There is no industry on the current tribal land, unemployment is high, and the majority of the Tribe lives at or below the poverty line.

In June of 1992, the Tonkawas made a written request to Texas Governor Ann Richards to select the league of land granted in the 1866 Act and apportion it to their use. By letter dated June 25, 1992, the Governor advised the Tribe that the Tribe's request had been referred to Land Commissioner Garry Mauro, and that she had requested him to investigate the Tribe's claim. In a letter dated July 30, 1992, Mauro advised the Tribe that

5

[I]n 1867, at about the same time that the Tonkawa nation was removed by the United States Army to Fort Griffin, the United States imposed military rule on the State of Texas. The imposition of Reconstruction effectively deprived the civilian government of Texas of any ability to carry out the Act of 1866.

In the years following 1867, the entire public domain of the State of Texas was appropriated to other uses, including the establishment of the Permanent School Fund. All prior grants that were not surveyed and located prior to the exhaustion of the public domain cannot now be honored because there is no longer any public domain from which to award them. The Texas Constitution of 1876 prohibits the granting of any lands belonging to the Permanent School Fund without full compensation being paid.

I regret that the State of Texas is unable at this late date to honor the commitment made by the Legislature of 1866 because there is no public domain from which to award the league of land provided for in the Act of 1866.

DISTRICT COURT PROCEEDINGS

The Tribe sought a writ of mandamus from the Texas Supreme Court. That court denied the Tribe leave to file the writ on July 8, 1993. Having exhausted its attempts to secure the league of land directly from the State of Texas, the Tonkawas filed this action.

In the Tribe's Complaint, filed November 15, 1993, they requested the district court to declare that the 1866 Act granted the Tribe an enforceable interest, claim, and right to land that was not divested by the subsequent dedication of land to the Permanent School Fund, or, alternatively, that if the Tribe's interest and claim were so divested, such divestiture violated the Nonintercourse Act, 25 U.S.C. § 177. In short, the Tribe sought a court order directing the State to designate a league of land to be used as a homeland by the Tribe and to take all steps necessary to

6

place the Tribe in possession of the land.

The district court, upon consideration of the parties' cross motions for summary judgment, granted summary judgment for the State and dismissed the case with prejudice. The ruling was based on the district court's finding that the Tonkawas never retained a vested property interest in the proposed league of land and that the Tribe's claim does not come within the purview of the Nonintercourse Act.

## STANDARD OF REVIEW

Appellate courts review summary judgments *de novo,* applying the same standard as the district court. *Bodenheimer v. PPG Indus. Inc.,* 5 F.3d 955, 956 (5th Cir.1993). Summary judgment shall be rendered if there is no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). In making its determination, the court must draw all justifiable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986).

Additionally, treaties and statutes should be liberally construed in favor of Indian tribes, with ambiguous provisions interpreted to their benefit. *See, e.g., Winters v. United States,* 207 U.S. 564, 576-77, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832).

## NONINTERCOURSE ACT

a. Elements of a Nonintercourse Claim.

To establish a violation of the Nonintercourse Act[3] ("the Act") the Tribe must show that (1) it constitutes an Indian tribe within the meaning of the Act; (2) the Tribe had an interest in or claim to land protected by the Act; (3) the trust relationship between the United States and the Tribe has never been expressly terminated or otherwise abandoned; and (4) the Tribe's title or claim to the interest in land has been extinguished without the express consent of the United States. *See Catawba Indian Tribe v. South Carolina,* 718 F.2d 1291, 1295 (4th Cir.1983), *rev'd on other grounds,* 476 U.S. 498, 106 S.Ct. 2039, 906 L.Ed.2d 490 (1986); *Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899, 902 (D.Mass.1977); *Narragansett Tribe of Indians v. Southern Rhode Island Land Dev. Corp.,* 418 F.Supp. 798, 803 (D.R.I.1976). The district court expressly determined, and Appellees concede, that

---

[3]The Nonintercourse Act, codified at 25 U.S.C. § 177, provides:

> No purchase, grant, lease, or other conveyance of lands, or of any title of claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purpose of any lands by them held or claimed, is liable to a penalty to $1000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the appropriation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

8

the Tribe has satisfied the first and third elements. There is likewise no dispute concerning the fourth element. Rather, the district court's decision was based on its holding that the Tribe failed to establish the second element—that is, the Tribe had no interest in or claim to land protected by the Nonintercourse Act.

b. The District Court's Analysis.

The district court relied on the Supreme Court's decision in *United States v. Rowell,* 243 U.S. 464, 37 S.Ct. 425, 61 L.Ed. 848 (1917). In *Rowell,* the plaintiff, an adopted member of the Kiowa, Comanche, and Apache Tribes, asserted a vested property right and a right to issuance of an allotment under a statute that authorized and directed "the Secretary of the Interior ... to issue a patent in fee for the tract in controversy to James F. Rowell." *Rowell,* 243 U.S. at 465, 37 S.Ct. at 426. Rowell argued that the statute was a grant *in praesenti.* The Supreme Court stated:

> But it is insisted that the provision of June 17, 1910, was a grant in praesenti and operated in itself to pass the full title to Rowell, and therefore that he had a vested right in the land which the repealing act could not affect. Of course, a grant may be made by a law as well as by a patent issued pursuant to a law, but whether a particular law operates in itself as a present grant is always a question of intention.

*Rowell,* 243 U.S. at 469, 37 S.Ct. at 427. In the statute in controversy, there were no words of present grant but only a direction to the Secretary of Interior to issue a patent to Rowell. The Supreme Court held that the statute should be construed only as a proposal by the government, which was amendable and repealable at the will of Congress. Because the act in controversy had not been carried into effect by the issuance of an allotment, no vested

9

property right ever accrued in favor of Rowell.

The district court found, under the reasoning in *Rowell,* that no vested property right accrued in favor of the Tribe under the 1866 Act.

> The 1866 Act set aside the league of land so long as the Tribe used it as a homeland. It directed the Governor, in permissive rather than mandatory language, to set aside the land. The land was never set aside by the Governor, the Tribe never used any "league of land" as its homeland.... The Texas Legislature, in subsequent legislation, dedicated all of the unappropriated public domain to other purposes. The Tonkawas never retained a vested property interest in the proposed league of land. The interest at best could have been correctly characterized as a mere expectancy—an expectancy which was extinguished when the State dedicated the public domain to other purposes.

Memorandum Opinion and Order, July 21, 1994, p. 16. The district court went on to hold that the Tribe's claim does not come within the purview of the Nonintercourse Act because a cause of action under that Act requires an "alienation of Indian Lands." Because the Tonkawas never held the land as their own or used it as a homeland, there was no alienation of Indian Lands under these circumstances, according to the district court.

The Tribe contends on appeal that the 1866 Act granted the Tribe, at the minimum, a present equitable interest in or claim to a league of unappropriated land in Texas. When the legislature later disposed of all the remaining unappropriated land, they argue, it extinguished the Tribe's claim in violation of the Nonintercourse Act.

c. The Reach of the Nonintercourse Act

We must analyze the question thus presented in the context of Congressional intent and judicial interpretation of the

10

Nonintercourse Act.  It was originally enacted in 1790, *see Mohegan Tribe v. Connecticut,* 528 F.Supp. 1359, 1362-63 (D.Conn.1982), and the current version dates to 1834.  25 U.S.C. § 177 (1983).  The Act's purpose is to prevent unfair, improvident, or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress. *Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 119, 80 S.Ct. 543, 555, 4 L.Ed.2d 584 (1960).  The Act broadly protects Indian tribes' rights to and interests in land:

> The Indian Nonintercourse Act ... has been perhaps the most significant congressional enactment regarding Indian lands. The Act's overriding purpose is the protection of Indian lands.  It acknowledges and guarantees the Indian tribes' right of possession and imposes on the federal government a fiduciary duty to protect the lands covered by the Act.

*United States on behalf of Santa Ana Indian Pueblo v. University of New Mexico,* 731 F.2d 703, 706 (10th Cir.), *cert. denied,* 469 U.S. 853, 105 S.Ct. 177, 83 L.Ed.2d 111 (1984) (citations omitted).  The Act applies to "any title or claim" to real property, including nonpossessory interests.  *See United States v. Devonian Gas & Oil Co.,* 424 F.2d 464, 467 n. 3 (2d Cir.1970) (Nonintercourse Act applies to oil and gas leases); *Mohegan Tribe,* 528 F.Supp. at 1370 ("Whether or not Connecticut held the fee to the land in question, it could not alienate Indian land without the consent of the federal government after the passage of the first Nonintercourse Act in 1790");  Lease of Indian Lands for Grazing Purposes, 18 Op.Att'y Gen. No. 583 (July 21, 1885) ("This statutory provision [§ 177] is very general and comprehensive.  Its operation does not depend upon the nature or extent of the title to the land which the

tribe or nation may hold.").

The Nonintercourse Act protects a tribe's interest in land whether that interest is based on aboriginal right, purchase, or transfer from a state. *See, e.g., Alonzo v. United States,* 249 F.2d 189, 196 (10th Cir.1957) (grants made by governments of Spain and Mexico and by purchase), *cert. denied,* 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958); *Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir.1975) (grants by state); *United States v. 7405.3 Acres of Land,* 97 F.2d 417, 422 (4th Cir.1938) ("[I]t makes no difference that title to the land in controversy was originally obtained by grant from the state of North Carolina."); *see also, Oneida Indian Nation v. County of Oneida,* 434 F.Supp. 527, 538 (N.D.N.Y.1977) (Nonintercourse Act protects land reserved for tribe in treaty with New York prior to passage of United States Constitution), *aff'd,* 719 F.2d 525 (2d Cir.1983), *aff'd in part and rev'd in part on other grounds,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). As stated in *Alonzo:*

> [T]he reason for the imposition of the restrictions [set forth in § 177] is in nowise related to the manner in which the Indians acquired their lands. The purpose of the restrictions is to protect the Indians ... against the loss of their lands by improvident disposition or through overreaching by members of other races.

*Alonzo,* 249 F.2d at 196 (footnote omitted).

The Nonintercourse Act's prohibition is effective against states, as well as private parties, who attempt to obtain tribal land in violation of its provisions. *See Mohegan Tribe v. State of Connecticut,* 528 F.Supp. 1359, 1364-65 (D.Conn.1982). In this

12

regard, the Act reaches not only conveyances by a tribe, but also any action by a state which purports to divest a tribe of an interest in land. *See Tuscarora Nation of Indians v. Power Authority of New York,* 257 F.2d 885, 893 (2d Cir.1958) (Nonintercourse Act applied to condemnation proceeding by state), *vacated as moot,* 362 U.S. 608, 80 S.Ct. 960, 4 L.Ed.2d 1009 (1960); *United States v. First Nat'l Bank,* 56 F.2d 634, 635 (D.Neb.1931) ("The Omaha tribe owned its lands before Nebraska became a state.... It is not competent for either the Congress by legislation or the states by court decisions to impair those rights."), *aff'd,* 59 F.2d 367 (8th Cir.1932).

d. Does the Tribe have a claim to lands covered by the 1866 Act?

The Tribe's claim arises under Texas legislation, to which we must apply Texas' rules of statutory construction. *See Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 372, 97 S.Ct. 582, 588, 50 L.Ed.2d 550 (1977) (holding state law governs disputed ownership of lands). In determining the meaning of the 1866 Act, our primary goal under Texas' rules of statutory interpretation is to ascertain the intention of the legislature. *See, e.g., Jones v. Del Andersen & Assoc.,* 539 S.W.2d 348, 350 (Tex.1976). This intention is to be ascertained from the language of the statute itself, *id.,* as of the time the law was passed, *Harris v. Ft. Worth,* 142 Tex. 600, 180 S.W.2d 131, 133 (1944), and further, from the entire act and not from isolated portions of it. *Calvert v. Texas Pipe Line Co.,* 517 S.W.2d 777, 781 (Tex.1974). The 1866 Act must be read in light of the circumstances and the

13

public policy prompting its passage. *Austin v. Collins,* 200 S.W.2d 666, 669 (Tex.Civ.App.—Ft. Worth 1947, writ ref'd n.r.e.).

The Tonkawas argue that the language in the 1866 Act directing that the land "shall be set apart" is a mandatory directive, revealing the legislature's intent to make a present grant of the property. The Tribe also points out that the Texas Legislature never repealed the 1866 Act or took any action specifically addressing the land after the 1866 Act. The State responds that "shall" is not necessarily mandatory, but may be directory only. *Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex.1976); *Hunt v. Heaton,* 631 S.W.2d 549, 550 (Tex.App.—Beaumont 1982), *aff'd,* 643 S.W.2d 677 (Tex.1982). "Provisions which do not go to the essence of the act to be performed, but which are for the purpose of promoting the proper, orderly and prompt conduct of business, are not ordinarily regarded as mandatory." *Lewis,* 540 S.W.2d at 310. Because the essence of the 1866 Act was to provide subsistence for the Tribe until such time as the Federal government took the Tonkawas in charge and provided for them, rather than to set apart particular real estate, we conclude that the "shall" language in question was not mandatory.

Next, the Tribe contends that the grant could have been perfected solely through ministerial duties of the state, and that it was therefore "self-executing and effective to grant the the tribe an equitable interest in the unappropriated public domain of the state as it existed in 1866." The Tribe distinguishes what it

14

refers to as the self-executing nature of the grant from unsurveyed land certificates. "A land certificate is merely the obligation of the government entitling the owner of it to secure the designated quantity of land by following the requirements of the law." *New York & T. Land Co. v. Thomson,* 83 Tex. 169, 17 S.W. 920, 923 (1891). The owner of a land certificate had to affirmatively take steps to locate the certificate to obtain any right to land. Not until the land certificate was properly located did it vest either equitable or legal title to land in the owner of the certificate. *See Sledge v. Humble Oil & Refining Co.,* 340 S.W.2d 517, 520 (Tex.Civ.App.—Beaumont 1960, no writ) ("An un-located land certificate vests in its holder no justiciable interest in any specific land."); *Abbott v. Gulf Prod. Co.,* 100 S.W.2d 722, 724 (Tex.Civ.App.—Beaumont 1936, writ dism'd w.o.j.). Under the 1866 Act, the Tribe was not required to take any action to perfect its interest in the land granted, but rather the burden of acting was upon the state.

The Tribe cites *Hogue v. Baker,* 92 Tex. 58, 45 S.W. 1004 (1898), in which the Texas Supreme Court held that a constitutional provision establishing that one-half of the public domain of the state would be allocated to the perpetual public school fund was self-executing. The Court held that the provision conferred the school fund with an equitable right to its share, even though the legislature retained authority over the partition of the lands. The State distinguishes *Hogue,* arguing that unlike a grant to another party, Texas' grant to the public school fund was actually

15

a grant to itself which did not rest on the issuance of a patent.

We conclude that the language in the 1866 Act was not a self-executing grant of land to the Tonkawas. The Act required action by the State (designation of the location of the league of land) as well as action by the Tribe (the making of a tribal homeland on the designated land) in order for the Tribe to take benefit from the grant. Because these two conditions were never fulfilled, the grant was never perfected.

Finally the Tonkawas argue, citing *Jones v. Meehan,* 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899), that federal law conferred them with an equitable interest in the land. In *Jones,* the Court held that the reservation of land pursuant to a treaty created an equitable title in the Chickasaw Indian tribe, even though the land was not yet precisely located or surveyed. This analogy is unpersuasive; the Chickasaws acquired an equitable interest through a treaty with the United States supported by valid consideration. Although the Texas Legislature recited the Tonkawas' past fidelity to Texas and their indigency as the motivation for the 1864 Resolution, there is no evidence of bargained-for consideration exchanged for an interest in land.

In sum, we hold that the grant was not mandatory or self-executing, and vested no interest, equitable or otherwise, in the Tribe. The purpose of the 1866 Act was to provide for the surviving Tonkawa Indians until such time as the federal government could provide for them. At the time of the enactment, Texas considered this an obligation of the "central government," *see* § 2

16

of the 1866 Act, and even applied for reimbursement from the federal government for sums expended out of the appropriation contained in the 1866 Act. The fee was reserved to the state and the Tribe was entitled to use of the land only so long as it served as their homeland. It is clear that the Tribe's claim to the land, as well as to the money and guns mentioned in the 1866 Act, was extinguished when the Tribe was placed on the Oklahoma reservation. The public domain, from which the potential grant would have been carved out, was in fact later disposed of by various acts of the Legislature, as required by the 1866 Act.

e. Does the Tribe have a Nonintercourse Act "claim"?

The Tonkawas assert that the language of the Act, which prohibits the alienation "of lands, or any title *or claim thereto* " (emphasis added) covers their "claim" although it is unvested. The Tribe relies primarily on *Oneida Indian Nation v. New York,* 691 F.2d 1070, 1084 (2d Cir.1982), where the Second Circuit concluded that an Indian tribe's interest in land was covered by the Act even though the land was unprotected by legal title. A crucial distinction, however, lies in the fact that the Oneida tribe had a possessory interest in the disputed land. Indeed, this is consistent with the purpose of the Act, which was to protect Indian tribes' aboriginal title to land on which they live. There being no support for the Tribe's claim under Texas law, the Tribe's proposed distinction between vested property rights and unvested "claims" provides them no basis for recovery.

ELEVENTH AMENDMENT

17

The State filed a Motion to Dismiss in the district court contending that the court lacked jurisdiction over this cause of action because the suit was barred by the Eleventh Amendment to the Constitution of the United States. The district court, in its Order on Motion to Dismiss, stated that the Eleventh Amendment bar to suits against states is circumvented when: (1) the state has waived immunity and consented to suit, *Papasan v. Allain,* 478 U.S. 265, 276 n. 10, 106 S.Ct. 2932, 2939 n. 10, 92 L.Ed.2d 209 (1986); (2) Congress has clearly expressed its intent to abrogate or limit that immunity through its legislative authority, *Quern v. Jordan,* 440 U.S. 332, 333-34, 99 S.Ct. 1139, 1141-42, 59 L.Ed.2d 358 (1979); or (3) the suit is instituted under a fiction which allows suits for prospective injunctive relief against a state official in vindication of a federal right, *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The district court focused its analysis on the second exception—Congressional abrogation of Texas' immunity from suit. The Tribe sought, through judicial process, to enforce rights created by the Nonintercourse Act. The district court found that Congress clearly intended to abrogate the States' Eleventh Amendment immunity when it enacted the Nonintercourse Act and had the power to do so under the Indian Commerce Clause,[4] citing *Oneida Indian Nation of New York v. Oneida,* 719 F.2d 525, 543 (2nd Cir.1983), *aff'd in part and rev'd in part on other grounds,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). The

---

[4]"The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." U.S. Const. art. I, § 8, cl. 3.

18

Order on Motion to Dismiss was not appealed. The Tribe adopts the district court's position below as its position on appeal as to the immunity question. The State argues on appeal its contention that it was immune from suit, but nevertheless contends that this Court need not reach the questions of whether Congress abrogated Texas' Eleventh Amendment immunity when it enacted the Nonintercourse Act and, if so, whether Congress possessed the power to do so. We agree.

While we could raise the issue *sua sponte* because the Eleventh Amendment operates as a jurisdictional bar, *Ysleta Del Sur Pueblo v. Texas,* 36 F.3d 1325, 1335 (5th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1358, 131 L.Ed.2d 215 (1995), we do not. Even if Congress validly waived the State's Eleventh Amendment immunity here, the appellants have no claim for relief. Further, because this case turns on the interpretation of a Texas Act with narrow application, this precise immunity question is not likely to recur so as to require appellate court guidance for district courts. *See Texas Employers' Ins. Ass'n v. Jackson,* 862 F.2d 491, 496-97 n. 8 (5th Cir.1988). We therefore decline to reach the question of Eleventh Amendment immunity.

### CONCLUSION

We affirm the district court's summary judgment in favor of the State, and decline to reach the Tribe's argument premised on 42 U.S.C. § 1983.

AFFIRMED.

19