Paul L. Maloney, United States District Judge
This lawsuit considers the nature of the title to a single parcel of land held by the Bay Mills Indian Community. In August 2010, Bay Mills Indian Community (Bay Mills) purchased a small parcel of land which has come to be called the "Vanderbilt Parcel." Bay Mills claims to have bought the property using funds from a Land Trust established by the Michigan Indian Land Claim Settlement Act, which provides that property purchased with the funds are "held as Indian lands are held." Subsequently, Bay Mills filed this lawsuit seeking a declaration that the State of Michigan lacks authority over the parcel of land and that the laws of the Bay Mills Indian Community apply to the parcel. The Court concludes that Bay Mills did not acquire this property subject to federal restrictions on alienation. Accordingly, the property is subject to Michigan's authority, Bay Mills cannot obtain the relief it seeks in the lawsuit, and Defendant Snyder is entitled to summary judgment.
I.
Bay Mills filed an amended complaint, which is the controlling pleading in this lawsuit. (ECF No. 25.) Currently pending is Defendant Snyder's motion for summary judgment. (ECF No. 53.) The Court held a hearing on the motion. Generally, the parties do not dispute the material facts relevant to this motion.
Bay Mills is a federally recognized Indian tribe. Michigan v. Bay Mills Indian Cmty. , 572 U.S. 782, 134 S.Ct. 2024, 2028, 188 L.Ed.2d 1071 (2014). At one point, the Bay Mills people, or their predecessors, resided throughout the eastern half of Michigan's upper peninsula and most of the northeast portion of the Michigan's lower peninsula. (Compl. ¶ 11 PageID.165.) Through the Treaty of March 28, 1836, the Bay Mills Indian Community ceded much of their lands to the United States. (Id. ¶ 11.) Currently, the Bay Mills reservation is located in the northeast portion of Michigan's Upper Peninsula, along the shore of Lake Superior. (ECF No. 54-2 Map PageID.435.)
In 1948, Congress created the Indian Claims Commission (ICC) to resolve historic claims by Indian tribes against the United States. Bay Mills filed claims with the ICC related to compensation for land ceded or sold to the United States in the 1836 Treaty, and several other treaties.
*574 (Compl. ¶ 13 PageID.165.) Bay Mills ultimately secured a money judgment from the ICC. (Id. ) Congress appropriated money in 1971 to pay the money judgment, but the funds were not distributed. (Id. ¶ 14.)
Relevant to the competing interpretations of a different statute that is the focus of this lawsuit, Congress enacted the Indian Gaming Regulatory Act (IGRA) in 1988, which provides a statutory basis for gaming operations run by Indian tribes. 25 U.S.C. § 2702(1). The IGRA authorizes gaming only on "Indian lands," which are defined as (1) all lands within the limits of any Indian reservation, (2) any lands title to which is either held in trust by the United States for the benefit of any Indian Tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power. Id. § 2703(4). The IGRA further provides that gaming may occur only in conformity with a valid compact between the State in which the gaming activities are located and the Indian tribe. Id. § 2710(d)(1)(C).
Several years after the IGRA became law, in 1993, Bay Mills and the State of Michigan negotiated and then entered into a Tribal State Gaming Compact. Bay Mills Indian Cmty. , 134 S.Ct. at 2029. The Compact permits Bay Mills to operate Class III gaming activities on its own Indian lands and, conversely, prohibits Bay Mills from operating gaming activities outside of its own Indian lands. Id. By permitting Class III gaming operations only in conformance with a valid Tribal-State compact, the IGRA also prohibits Bay Mills from conducting gaming operations outside of its own Indian lands.
In 1996, Bay Mills sued the Secretary of the Interior to force the distribution of the ICC judgment funds. (Compl. ¶ 14 PageID.165.) Bay Mills sought a writ of mandamus to force the Secretary to develop a plan to distribute the funds allocated by Congress for its ICC claims. (Id. ) In December 1997, Congress enacted the Michigan Indian Land Claims Settlement Act (MILCSA) to implement the ICC judgments and to allocate the funds. Section 107 provided for a plan for the use and distribution of the Bay Mills Indian Community Funds. Bay Mills had to establish a Land Trust, into which twenty percent of the money received would be deposited. MILCSA § 107(a)(1). The statute then identified how the interest earned from that money could be spent.
(3) The earnings generated by the Land Trust shall be used exclusively for improvements on tribal land or the consolidation and enhancement of tribal landholdings through purchase or exchange. Any land acquired with funds from the Land Trust shall be held as Indian lands are held.
MILCSA § 107(a)(3).
This lawsuit concerns the status of title to the Vanderbilt Parcel, 27 acres of land in Corwith Township, Michigan.[1] (Compl. ¶ 25.) In August 2010, using funds from the Land Trust, Bay Mills purchased the property, the Vanderbilt Parcel.[2] Corwith *575 Township is located in Otsego County, in the upper part of Michigan's lower peninsula. The Township is approximately fifty miles south of the Mackinac Bridge, which connects Michigan's lower and upper peninsula. The Vanderbilt Parcel is about 125 miles from the current Bay Mills reservation. Bay Mills Indian Cmty. , 134 S.Ct. at 2029. Three months after purchasing the property, in November 2010, Bay Mills opened a Class III gaming facility on the Vanderbilt Parcel. (Compl. ¶ 36 PageID.168.) On December 21, 2010, Michigan sued to close the facility. (Compl. ¶ 43 PageID.169.) Ultimately, the Supreme Court held that Bay Mills enjoyed tribal sovereignty and could not be sued by Michigan in federal court. Bay Mills Indian Cmty. , 134 S.Ct. at 2039. In 2011, Bay Mills filed this lawsuit.[3] Defendant Snyder filed the pending motion for summary judgment.
II.
A.
Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a) and (c) ; Payne v. Novartis Pharms. Corp. , 767 F.3d 526, 530 (6th Cir. 2014). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. Fed. R. Civ. P. 56(c)(1) ; Hollis v. Chestnut Bend Homeowners Ass'n , 760 F.3d 531, 543 (6th Cir. 2014). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Matsushita Elec. Indust. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ). In resolving a motion for summary judgment, the court does not weigh the evidence and determine the truth of the matter; the court determines only if there exists a genuine issue for trial. Tolan v. Cotton , 572 U.S. 650, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (quoting Anderson , 477 U.S. at 249, 106 S.Ct. 2505 ).
B.
The dispute between the parties, both the lawsuit itself and the pending motion, requires the Court to interpret an act of Congress. The United States Supreme Court has noted that "the standard principles of statutory construction do not have their usual force in cases involving Indian law." Montana v. Blackfeet Tribe of Indians , 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). "The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." Oneida Cty., New York v. Oneida Indian Nation of New York State , 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ( Oneida II ). When a statute is ambiguous, meaning that the statute is susceptible to more than one plausible construction, the choice between the two is determined by a principle "deeply rooted" in Indian jurisprudence: statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted for their benefit.
*576 Cty. of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation , 502 U.S. 251, 269, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) (quoting Blackfeet Tribe , 471 U.S. at 766, 105 S.Ct. 2399 ); White Mountain Apache Tribe v. Bracker , 448 U.S. 136, 143-44, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) ("Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.").
Canons of statutory construction, however, are not mandatory guidelines. Chickasaw Nation v. United States , 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). Where the statute is not ambiguous, or congressional intent is clearly expressed, the canon of construction requiring ambiguities be resolved in favor of Indians does not apply. South Carolina v. Catawba Indian Tribe, Inc. , 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). And, where a court interprets a congressional statute, as opposed to an Indian treaty, the canon directing interpretations favorable to Indian tribes is not given any particular weight or priority. Chickasaw Nation , 534 U.S. at 95, 122 S.Ct. 528. The Supreme Court has commented that canons are typically countered simply by pointing to a different canon that points to a different result. Id. at 94, 122 S.Ct. 528.
III.
For this motion, Defendant presents a narrow question. Defendant asks the Court to interpret the phrase "held as Indian lands are held," which is found in § 107 of MILCSA.[4] Defendant argues the phrase does not restrict the land purchased with interest from the Land Trust to be Indian land such that the land must fall into one of the three categories of Indian land, as that term is defined in the IGRA. Bay Mills believes that the phrase automatically requires that land purchased with interest from the Land Trust is held with a federal restriction on alienation, one of the three categories of Indian land, as that term is defined in the IGRA.[5]
Defendant organizes his brief into three primary arguments: (1) the plain language of the MILCSA does not support Bay Mills' theory, (2) legislative history does not support Bay Mills' theory, and (3) Congress did not intend to preempt state gaming laws when it enacted MILCSA. The first argument has multiple subtopics. The Court will address each of Defendant's arguments, and then separately address some of Bay Mills' responses.
A. Plain Language
First, the Court agrees with Defendant that the statutory phrase "held as Indian lands are held" has a plain and ordinary meaning. The phrase is not ambiguous. As used in MILCSA, the phrase "held as Indian lands are held" means that Bay Mills, using interest from the Land Trust, may acquire and hold land with all possible titles. The disputed phrase clarifies that Congress was not designating a particular form of title for the land purchased through the Land Trust. Indian tribes can hold property under multiple forms of title, just as non-Indians can, i.e., fee simple and leasehold interests. Cohen's Handbook on Federal Indian Law § 15.02 at 995-96 *577 (Nell Newton, et al., eds., 2012 ed.). Indian tribes can also hold property in forms of title unique to Indian tribes, e.g., fee simple subject to a federal restriction on alienation. See 25 U.S.C. § 177. And, the federal government can also hold Indian land in trust, for the benefit of an Indian tribe. See 25 U.S.C. § 5101, et seq.[6] In MILCSA, Congress authorized Bay Mills to make land purchases on the open market using specific funds. Ordinarily, when an Indian tribe purchases land on the open market from non-Indians, and outside its reservation, the tribe obtains fee simple title. Cohen's Handbook § 15.04( [5] at 1015. But, Bay Mills could ask for the land to be taken into trust, which would alter the title.
This interpretation of the phrase does not render the phrase mere surplusage, as Bay Mills argues. The phrase is not a mere statement of the obvious. In many respects, the status of land has been a defining feature of the relationship between the Federal Government and native peoples. In the earliest days, this new Nation was competing with the native people for space and the treaties reflected this principle concern. See Cohen's Handbook § 1.03[1] at 26 ("To overriding goal of the United States during the treaty-making period was to obtain Indian lands, ...."). And, the Supreme Court has recognized that the sovereignty retained by Indian tribes "is of a unique and limited character" that "centers on the land held by the tribe and on tribal members within the reservation." Plains Commerce Bank v. Long Family Land and Cattle Co. , 554 U.S. 316, 327, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008). As a result, when Congress enacts legislation implicating land ownership by tribes, Congress typically addresses the status of the land, even when the title acquired is fee simple. See, e.g. , Connecticut Indian Land Claims Settlement Act, 25 U.S.C. § 1753(b)(8) ("Land or natural resources acquired under this subsection which are located outside of the settlement lands shall be held in fee by the Mashantucket Pequot Tribe, and the United States shall have no further trust responsibility with respect to such land and nature resources. Such land and natural resources shall not be subject to any restriction on alienation under the laws of the United States."); Indian Revolving Loan Fund, 25 U.S.C. § 1466 ("Title to any land purchased by a tribe or an individual Indian which is outside the boundaries of the reservation or approved consolidation area may be taken in trust if the purchaser was the owner of trust or restricted interests in the land before the purchase, otherwise title shall be taken in the name of the purchasers without any restriction on alienation, control or use.").
Second, Congress's decision not to specifically mention the restriction on alienation in MILCSA does not favor either party's proposed interpretation. Defendant argues that because Congress did not say the land acquired was held with restrictions on alienation, this Court should not interpret the phrase as imposing that restriction. But, Bay Mills correctly notes that Congress did not say that the land acquired would be free from restrictions on alienation, as it did in the Indian Revolving Loan Act and in the Connecticut Indian Land Claim Settlement Act. Standing alone, both inferences are plausible. When other factors considered, however, Defendant's interpretation becomes more plausible *578 The lack of procedural safeguards in MILCSA for tribal acquisition of land does weigh in favor of Defendant's interpretation of the statute, that Congress did not intend for the lands acquired to be held with restrictions on alienation. Congressional directives regarding procedures for acquisition of land in settlement agreements are hardly uniform. In most settlement acts, Congress has stated that that land acquired will be held in trust. Sometimes, the settlement act specifically refers to the procedures for taking lands into trust in the Code of Federal Regulations. E.g. , Cherokee, Choctaw, and Chickasaw Nations Claims Settlement, 25 § 1779d(b)(1)(A) ("The Secretary may accept such lands into trust ... pursuant to the authority provided in section 465 of this title and in accordance with the Secretary's trust land acquisition regulations at part 151 of Title 25, Code of Federal Regulations, ...."). Sometimes, the settlement act implies that the federal regulations for taking lands into trust are not applied to certain lands identified in the settlement agreement. E.g. , Washington Indian (Puyallup) Land Claims Settlement, 25 § 1773c ("In accepting lands in trust (other than those described in section 1773b of this title ) ..., the Secretary shall exercise the authority provided him in section 465 of this title, and shall apply the standard set forth in part 151 of title 25, Code of Federal Regulation, ....") (emphasis added). And, sometimes the settlement act states only that the lands will be taken into trust, without clarifying whether the trust regulations apply. E.g. , Connecticut Indian Land Claims Settlement, 25 § 1754(b)(3)(7) ("Lands or natural resources acquired under this subsection which are located within the settlement lands shall be held in trust by the United States for the benefit of the Tribe.").
In contrast, one settlement act, the Seneca Nation Land Settlement Claim Act provides for the acquisition of land to be held in fee with restriction on alienation. 25 U.S.C. § 1774f(c). And, that settlement act contains a procedure permitting state and local authorities an opportunity for notice and comment. Because most settlement acts specify that land will be taken into trust, the Second Circuit commented that the Seneca Nation act was "unique in creating a mechanism for newly acquired tribal lands to held in restricted fee." Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri , 802 F.3d 267, 274 (2d Cir. 2015). The court noted that
Most restricted fee lands attained this status under the allotment system of the late nineteenth and early twentieth centuries, when the federal government transferred parcels of tribal lands to individual Indians via either "trust patents" or "restricted fee patents."
...
Most newly acquired tribal lands today are held in trust by the federal government pursuant to the Indian Reorganization Act of 1934 ("IRA), 25 U.S.C. §§ 461 - 494(a).
...
In contrast to the IRA, § 1774f(c) of the SNSA authorizes the Secretary of the Interior to permit the Seneca Nation to hold lands that the tribe acquires with SSNA funds in restricted fee status. As mentioned previously, the SNSA appears to be unique in this regard.
Id. at 274-75 (citations omitted).[7]
The lack of any procedural requirements in MILCSA suggests that Congress did *579 not intend for the land acquired by Bay Mills to be held with any particular status or title. In the one settlement act where Congress specified that the land acquired would be held by the tribe with restrictions on alienation, Congress imposed a notice and comment procedure permitting state and local governments to have some input into the decision. No such procedure was included in MILCSA. Were the Court to adopt Bay Mills' interpretation, the Tribe could purchase real estate anywhere in the State of Michigan, creating the potential for conflicts with State and local governments, and without any recourse for those entities. And, while the Vanderbilt Parcel is located in a relatively rural area of Michigan, the possibility exists that Bay Mills could purchase lands in much more developed areas of the State.
Defendant's remaining arguments bear mentioning, but do not resolve the matter. The lack of explicit federal superintendence over the land or the acquisition process does not establish that the land is acquired without restrictions on alienation. The premise of this argument, that land held with restrictions on alienation are subject to federal superintendence, is suspect. Defendant's authority, United States v. Bowling , 256 U.S. 484, 486-87, 41 S.Ct. 561, 65 L.Ed. 1054 (1921) involved an allotment parcel, a situation altogether different from what Bay Mills acquired. And, in Buzzard v. Oklahoma Tax Commission , 992 F.2d 1073, 1076 (10th Cir. 1993), the Tenth Circuit rejected the claim that land held with restrictions on alienation, standing alone, established that the federal government exercises any superintendence over the land.
Defendant also urges the Court to take notice of the opinions issued by the Department of the Interior and the National Indian Gaming Commission concerning the status of the title to the Vanderbilt Parcel. Neither opinion is entitled to any deference. Chevron deference does not apply because the disputed phrase is not ambiguous and because Congress did not delegate any authority to either the Department of the Interior or the National Indian Gaming Commission to implement this specific portion of MILCSA. See Gonzales v. Oregon , 546 U.S. 243, 255-56, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) ; United States v. Mead Corp. , 533 U.S. 218, 227-31, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Indeed, MILCSA explicitly withdrew any oversight by the Secretary of the Interior concerning the approval and acquisition of land using funds from the Land Trust. MILCSA § 107(a)(6) ("Notwithstanding any other provision of law, the approval of the Secretary of any payment from the Land Trust shall not be required and the Secretary shall have not trust responsibility for the investment, supervision, administration, or expenditure of funds from the Land Trust."). The Court assumes that the Department of the Interior would have some delegated authority concerning Indian gaming, but that delegation would not extend to offering interpretations of settlement acts that do not even mention gaming. The Court views the opinions as persuasive authority only.
B. Legislative History
MILCSA's legislative history does not resolve the statutory interpretation question presented by Defendant. Because the Court concludes the statute is not ambiguous, and the disputed phrase can be given it plain and ordinary meaning, any consideration of legislative history is unnecessary. See Rote v. Zel Custom Mfg., LLC , 816 F.3d 383, 392-93 (6th Cir. 2016).
Even if the Court were to consider the legislative history, it is too sparse to be *580 helpful and presents more questions than it answers. An early version of MILCSA, which was drafted by the House Committee on Resources, provided that the land acquired through the Land Trust would be held in trust. (ECF No. 54-7 PageID.495.) Ada Deer, then Assistant Secretary of Indian Affairs sent a letter to the Committee requesting that language be added to clarify that the Secretary retains discretion to take the land into trust under existing regulations. (ECF No. 54-8 PageID.505.) The legislative history presented by the parties gives no explanation for why the final version of MILCSA removed the provision that the land would be taken into trust. Defendant has produced one other letter about MILCSA from Michael Anderson, then Deputy Assistant Secretary of Indian Affairs. Anderson recommended removing the sentence that contains the phrase "held as Indian lands are held" because it was "unnecessary." (ECF No. 54-9 PageID.510.) Bay Mills disagreed with Anderson's suggestion. (ECF No. 74 Tierney Dec. ¶ 4 PageID.846.) The final version of MILCSA contained the sentence that Anderson thought was unnecessary. At best, the Court might speculate about why the language was not changed. But, based on this record, the Court could not make an inference-a reasoned conclusion-about the decision to retain the language "held as Indian lands are held."
Finally, the comments by the Congressional Budget Office(CBO) offer no useful insight. The CBO wrote that the House bill would "not affect state and local governments." (ECF No. 5407 PageID.500.) This statement must be put in context. The letter from the CBO was written in August 1997, and addressed the House bill, which contained the language that the land would be taken into trust. The paragraph appears to comment on whether the bill would cause various entities, the federal, state, local and tribal governments, to spend money. The CBO concluded it would not. The Court cannot conclude the CBO meant anything more than the fact that state and local governments would not have to spend money.
C. State Preemption
The United States Supreme Court has directed that "courts should not lightly infer preemption." Int'l Paper Co. v. Ouellette , 479 U.S. 481, 491, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Because preemption should not be "lightly inferred," the lack of explicit language in MILCSA suggests that Congress did not intend for the land acquired through the Land Trust to be held with restrictions on alienation.
Cases involving state taxation of Indian lands provides a framework for resolving whether MILCSA-acquired land is subject to state and local laws. The Supreme Court has made "repeated statements ... to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." Mescalero Apache Tribe v. Jones , 411 U.S. 145, 148-49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). Like Mescalero , many of the Indian preemption cases that have reached the Supreme Court involved a state attempting to collect taxes from a tribe. And, the Court has recognized that "the power to tax involves the power to destroy." Almost twenty years after Mescalero , the Supreme Court reaffirmed that holding, stating that "our cases reveal a consistent practice of declining to find that Congress has authorized state taxation unless it has 'made its intention to do so unmistakably clear.' " Cty. of Yakima , 502 U.S. at 258, 112 S.Ct. 683 (quoting Blackfeet Tribe , 471 U.S. at 765, 105 S.Ct. 2399 ). MILCSA contains no "unmistakably clear" language indicating that Congress intended to *581 preempt any state law when it authorized Bay Mills to hold the newly acquired land "as Indian lands are held."
Bay Mills argues that Congress has provided for explicit preemption of state gaming laws through the IGRA. See Gaming Corp. of America v. Dorsey & Whitney , 88 F.3d 536, 544 (8th Cir. 1996) (holding that the "text and structure of the IGRA, its legislative history, and its jurisdictional framework likewise indicate[ ] that Congress intended it to completely preempt state law."). Bay Mills reasons that, if it acquires the land with restriction on alienation, then the land is considered Indian land and Bay Mills can conduct gaming on the property without state oversight.
Bay Mills argument on the question of preemption suffers several problems. The conclusion that the Vanderbilt Parcel is held with restrictions on alienation would create a gaping hole, an end-around, to the tribal-state compact negotiations mandated by the IGRA. See 25 U.S.C. § 2710(d)(3). Again, assuming Bay Mills is correct, that it could conduct gaming on the Vanderbilt Parcel if it is held with restrictions on alienation, it would be able to do so without first negotiating with the State of Michigan. Bay Mills and Michigan have already entered into a gaming compact. When the compact was negotiated, Michigan would not have anticipated that, years later, Bay Mills could purchase land anywhere in the State and open a Class III casino. Nothing in MILCSA suggests Congress intended to give Bay Mills such authority.
Bay Mills' reasoning also begs the question of whether the land acquired is held in restricted fee. Assuming that Bay Mills is correct, and that if land acquired through the Land Trust is held with restrictions on alienation, then Bay Mill is probably correct that it could conduct gaming operations on that land. But, the fact Bay Mills can conduct gaming operations on Indian land does not compel the conclusion that Congress intended land acquired through the Land Trust to be Indian land, as that term is defined in the IGRA. The Tenth Circuit cautioned that that questions about gaming on Indian land and questions about title to land should not be collapsed into a single inquiry. " "[A]djudicating the question of whether a tract of land constitutes 'Indian land' for Indian gaming purposes is 'quite conceptually distinct' from adjudicating title to that land. One inquiry has little to do with the other as land status and land title 'are not congruent concepts in Indian law.' A determination that a tract of land does or does not qualify as 'Indian land' within the meaning of IGRA in no way affects title to the land." Kansas v. United State , 249 F.3d 1213, 1225 (10th Cir. 2001) (internal citation omitted).
Further undermining Bay Mills' reasoning, Bay Mills has not established that the IGRA is the proper reference for the definition of "Indian land." Congress has defined the term "Indian land" in multiple statutes, and not uniformly. Many statutes do use the same or similar definition of "Indian land" as IGRA. See, e.g. , 25 U.S.C. § 1680n(b) (Indian Health Care Improvement Act definition of "Indian land"). But, some statutes define "Indian land" as "Indian country," referencing 18 U.S.C. § 1151.[8] See, e.g. , 25 U.S.C. § 3653(3) (Indian *582 Tribal Justice Technical and Legal Assistance Act definition of "Indian land"); 25 U.S.C. § 4302(4)(A)(i) (Native American Business Development, Trade Promotion, and Tourism Act definition of "Indian land"). At first glance, the Vanderbilt Parcel would not fall into one of the three categories of land described in the definition of "Indian country."
IV.
In its response, Bay Mills offers two arguments that must be addressed. Bay Mills contends the phrase "held as Indian lands are held" is a term of art. Second, Bay Mills asserts that all land held by Indian tribes is subject to a restriction on alienation under the Indian Non-Intercourse Act. Neither argument is persuasive.
A. Term of Art
Bay Mills asserts that the phrase "held as Indian lands are held" is a term of art used in treaties and in legal opinions. Bay Mills argues that the phrase has been used to identify the scope of tribal authority over landholdings and the phrase means that the land is under tribal ownership and authority, subject only to the protection of the federal government.
Bay Mills has identified one treaty, the Treaty with the Wyandot (August 3, 1795) 7 Stat. 49, which specifies the nature of tribal authority over the land "relinquished" to the several tribes through the treaty.[9] Article V of the treaty clarified the "meaning of that relinquishment."
To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared, that the meaning of that relinquishment is this: The Indian tribes who have a right to those lands, are quietly enjoying them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States; but when those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and until such sale, the United States will protect all the said Indian tribes to the quiet enjoyment of their lands against all citizens of the United States, and against all other white persons who intrude upon the same. And the said Indian tribes again acknowledge themselves to be under the protection of the said United States and no other power whatever.
Bay Mills asserts that this passage "articulated an understanding of what it means for a tribe to hold Indian lands." (Resp. Br. at 8 PageID.764.) Bay Mills then contends that when Congress used the term "Indian land" in subsequent treaties, the phrase "Indian land" or "held as Indian lands are held" was used with this meaning. As presented by Bay Mills, the disputed phrase or a similar phrase appeared in five treaties between 1832 and 1854, none of which appear to have involved the Bay Mills people: (1) Treaty with the Winnebago, Art. 2 (September 15, 1832) 7 Stat. 370; (2) Treaty with the Chippewa, Art. 2 (September 26, 1833) 7 Stat. 431; (3) Treaty with the Oneida, Art. 2 (February 3, 1838) 7 Stat. 566; Treaty with the Stockbridge Tribe, Supplemental Article (November 24, 1848) 9 Stat. 955; and (5) Treaty with the Menominee, Art. 2 (May 12, 1854) 10 Stat.
*583 1064. To reinforce the argument, Bay Mills summarizes Supreme Court opinions from the 1800s describing tribal authority over tribal land.
The Court declines to find that the phrase "held as Indian lands are held," as used in MILCSA, is a term of art borrowed from treaties enacted in the 1700s and 1800s. Bay Mills' argument ignores guidelines issued by the Supreme Court for interpreting Indian statutes. In Oliphant v. Suquamish Indian Tribe , 435 U.S. 191, 206, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), the Court explained that
"Indian law" draws upon the treaties drawn and executed by the Executive Branch and legislation passed by Congress. These instruments, which beyond their actual text form the backdrop for the intricate web of judicially made Indian law, cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted them.
See Cent. Mach. Co. v. Arizona State Tax Comm'n , 448 U.S. 160, 166, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980) (stating that courts must interpret Indian statutes "in light of the intent of the Congress that enacted them."). Over the years, Congressional policy towards Indians has changed dramatically. See Cohen's Handbook § 101 at 7-8. The early policy of treaties and reservations gave way to a policy of allotments and assimilation, which gave way to the current approach of self-determination and self-governance. When the disputed phrase was used in the 1700s and 1800s, congressional understanding of Indian land holdings was different than it is today. In our earlier history, "Congress did not view the distinction between acquiring Indian property and assuming jurisdiction over Indian territory as a critical one, in part because '[t]he notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar.' " South Dakota v. Yankton Sioux Tribe , 522 U.S. 329, 343, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (quoting Solem v. Bartlett , 465 U.S. 463, 468, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) ).
In light of this guidance, the opinions cited by Bay Mills do not advance its argument. The cited portions of the opinions all discuss the nature of tribal holdings in land secured by a tribe through a treaty. See Worcester v. Georgia , 31 U.S. (6 Pet.) 515, 556-57, 8 L.Ed. 483 (1832) ; The New York Indians , 72 U.S. (5 Wall.) 761, 770-71, 18 L.Ed. 708 (1866) ; The Kansas Indians , 72 U.S. (5 Wall.) 737, 775-56, 18 L.Ed. 667 (1866). The cases do not consider the nature of tribal authority over land purchased on the open market. None of the three opinions interpreted the phrase "held as Indian lands are held." It is not clear from the opinions that the disputed phrase even appeared in the treaties discussed in each of the opinions. And, nothing in the record suggests that Congress in 1997, when enacting MILCSA, embraced a 150-year old understanding of how tribes held treaty land and grafted that understanding onto purchases of land on the open market.
In support of its interpretation, Bay Mills offers a declaration from Robert Clinton, a law professor with expertise in Indian history and law. But, Clinton's reasoning and conclusion fails to consider the contemporary congressional understanding of how Indian lands are held. While Clinton's declaration examines tribal interests in land from treaties in the 1800s through a variety of legal sources, those authorities shed no light on "common notions of the day and the assumptions of" the members of Congress who enacted MILCSA in 1997. The historical documents Clinton reviewed do not establish that, in 1997, the phrase "held as Indian lands are held" was *584 used "as a term of art that Congress employed in MILCSA." (ECF No. 71 Clinton Dec. ¶ 10d PageID.816.)
Simply put, nothing in the record indicates that the Congress that passed MILCSA in 1997 intended for a phrase used in treaties from the 1800s to have the same meaning today as it did approximately 150 years ago. When the disputed phrase was used in the 1800s, it was never used to describe open-market purchases of land. The two situations, the treaties and MILCSA, are different in significant ways. The Treaty with the Wyandot literally "put an end to a destructive war."[10] MILCSA was enacted "to provide for the fair and equitable division of the judgment funds." MILCSA § 102(b). Through the treaties, this Nation's federal government relinquished, gave, assigned or otherwise recognized certain land as belonging to a tribe or tribes. In MILCSA, Congress authorized funds for Bay Mills to use for open-market purchases of land. When the disputed phrase was used in the 1800s, Congress saw no need to distinguish between tribal acquisition of property and tribal jurisdiction over property. Bay Mills has not identified a single historical source that suggests that any Congress from the 1800s ever contemplated that a tribe might purchase land, let alone that the tribe might subsequently assert jurisdiction over that land. As the various taxation cases establish, Indian tribes today can acquire land that remains subject to state and local laws. See, e.g. , Cass Cty., Minnesota v. Leech Lake Band of Chippewa Indians , 524 U.S. 103, 113-14, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998) (tribal reacquisition of allotment lands that Congress made alienable and taxable did not reimpose the prohibition on taxation by the State). The more contemporaneous Indian statutes, like the settlement acts discussed above, indicate that Congress is aware of the different ways that Indian lands can be held. Those statutes also indicate that when Congress wants to specify the form of title acquired, it will do so.
B. Nonintercourse Act
Bay Mills argues that the Indian Nonintercourse Act controls the issue presented by Defendant and requires this Court to find that the Vanderbilt Parcel is subject to a restriction on alienation. The Nonintercourse Act, 25 U.S.C. § 177, was enacted in 1834, but has roots in legislation dating back to 1790, and remains in effect. See Mohegan Tribe v. Connecticut , 638 F.2d 612, 616-18 (2d Cir. 1980). The Nonintercourse Act provides, in relevant part,
No purchase, grant, lease, or other conveyance of lands, or any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution ....
25 U.S.C. § 177. The Second Circuit has held that the Nonintercourse Act applies throughout the entire United States. Mohegan Tribe , 638 F.2d at 616-21 (rejecting Connecticut's attempt to limit the scope of the Act to the original states and holding that Act contains "no language of limitation" and applies "to all Indian lands.").
The Supreme Court has not decided whether tribal land acquisitions through open-market purchases are protected from alienation under the Nonintercourse Act. The Court has, however, offered some indication as how the question would be resolved.[11] The Court noted it has "never *585 determined whether the Indian Nonintercourse Act ... applies to land that has been rendered alienable by Congress and later reacquired by an Indian tribe." Cass Cty. , 524 U.S. at 115 n.5, 118 S.Ct. 1904. The Court held that the Nonintercourse Act "merely codified the principle that a sovereign act was required to extinguish aboriginal title and thus a conveyance without the sovereign's consent was void ab initio ." Oneida II , 470 U.S. at 245, 105 S.Ct. 1245 ; see Oneida Indian Nation of New York v. Oneida Cty., New York , 414 U.S. 661, 677, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) ( Oneida I ) (discussing federal jurisdiction and distinguishing between "the claim of a right to possession derived from a federal grant to title whose scope will be governed by state law" from "the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession."). The Court has also concluded that a tribe "cannot unilaterally revive its ancient sovereignty, in whole or in part," by making an "open market purchase[ ] from current titleholders." City of Sherrill, New York v. Oneida Indian Nation of New York , 544 U.S. 197, 203, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005).
The answer to this question requires this Court to interpret the Nonintercourse Act by considering the views and assumptions of Congress in the 1830s. See Oliphant , 435 U.S. at 206, 98 S.Ct. 1011 ; Cent. Mach. Co. , 448 U.S. at 166, 100 S.Ct. 2592. The Nonintercourse Act does not define "lands," and at least one court has found that the Act extends to land purchases by a tribe.[12] See Alonzo v. United States , 249 F.2d 189, 195-96 (10th Cir. 1957). But, in 1834, and when the earlier versions of the Nonintercourse Act were passed, Congress would have understood tribal ownership of land and tribal authority over its land holdings as "coextensive." See Yankton Sioux Tribe , 522 U.S. at 343, 118 S.Ct. 789. Through the Nonintercourse Act, the United States acknowledged its role in preserving a tribe's right to occupy its historic land holdings. See Oneida II , 470 U.S. at 245, 105 S.Ct. 1245 ; Golden Hill Paugussett Tribe of Indians v. Weicker , 39 F.3d 51, 56 (2d Cir. 1994) ("In *586 enacting the Nonintercourse Act Congress codified the widely accepted principles that Indian nations held 'aboriginal title' to land they had lived on from time immemorial and that discovering nations held 'title in fee,' subject to the Indians' rights to occupancy and use of the land.").
Interpreting the scope of the Nonintercourse Act through this historic understanding, tribal acquisitions of land through open-market purchases do not establish a right of occupancy that qualifies for the protections of the Nonintercourse Act. Indian tribes can and do buy land that is not part of their historic land holdings. See, e.g. , Penobscot Indian Nation v. Key Bank of Maine , 112 F.3d 538, 540 (1st Cir. 1997) (involving investments in land that were used for mobile home parks). Those open-market purchases of real estate by Indian tribes do not create the sort of possessory right that accompanies aboriginal or Indian title. The restraint on alienation, found in the Nonintercourse Act protects aboriginal title, not all possessory claims; "the Nonintercourse Act ... put in statutory form what was or came to be the accepted rule-that the extinguishment of Indian title required the consent of the United States." Oneida I , 414 U.S. at 678, 94 S.Ct. 772 (italics added). More to the point, the Nonintercourse Act does not protect possessory interests other than aboriginal title because, when Congress enacted the Nonintercourse Act, "it did not contemplate that Indian tribes could hold land in fee simple." Penobscot Indian Nation , 112 F.3d at 549.
This outcome is consistent with the Ninth Circuit's decision in Lummi Indian Tribe v. Whatcom County, Washington , 5 F.3d 1355 (9th Cir. 1993), which held that open-market purchases in the 1970s and 1980s by the Lummi Indian Tribe, of land previously rendered alienable, did not fall within the scope of § 177. The Lummi Indian Reservation was created in 1855 in the Treaty of Point Elliott. Id. at 1356. As contemplated by the treaty, in 1884, the United States began to assign or allot approximately 10,000 acres of the reservation. Id. The four parcels of land involved in the dispute were subsequently determined to be alienable; the Bureau of Indian Affairs made the decision for one parcel and the Secretary of the Interior made the determination for the other three parcels. Id. The Lummi Tribe purchased the four plots in the 1970s and 1980s. Id. In 1989, the tribe filed the lawsuit claiming that the property tax levied by Whatcom County violated federal law. Id.
The Ninth Circuit concluded that the land was subject to the property taxes. Following several Supreme Court opinions, the court concluded that if the land was alienable, it was taxable. Id. The court found that it did not matter how the land was rendered alienable, by treaty or by the General Allotment Act. Id. at 1357. The court held that once Congress removes the restraints on alienation, the land remains alienable, regardless of the owner, which includes reacquisition by an Indian tribe. Id.
Bay Mills' claim to the Vanderbilt Parcel is similar to the claims in Lummi . Bay Mills has not asserted that the Vanderbilt Parcel was part of its land holdings subject to the restriction on alienation. It may be that Bay Mills had an historic claim to the Vanderbilt Parcel in 1834, when the Nonintercourse Act was passed. But, Bay Mills ceded its lands in the Michigan's lower peninsula to the United States in 1836. By doing so, Bay Mills no longer had any claim for aboriginal or Indian title to those lands. See Bates v. Clark , 95 U.S. 204, 208, 24 L.Ed. 471 (1877) ("The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it *587 continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case."). Following Lummi , Bay Mills' reacquisition of land it previously ceded does not revive the protections of the Nonintercourse Act. And, MILCSA is not an act of Congress that revives the restrictions on alienability.
Finally, the Court must note the practical consequences of Bay Mills' proposed interpretation, which were observed the Supreme Court in City of Sherrill . If Bay Mills is correct, it could "unilaterally assert sovereign control" over land parcels throughout Michigan. City of Sherrill , 544 U.S. at 220, 125 S.Ct. 1478. The result would be a "checkerboard of alternating state and tribal jurisdiction," that "would seriously affect landowners neighboring the tribal patches." Id. at 219-20, 125 S.Ct. 1478. "[L]ittle would prevent the Tribe from initiating a new generation of litigation to free the parcels from the local zoning or other regulatory controls that protect all landowners in the area." Id. at 220, 125 S.Ct. 1478. Because of "these practical concerns, Congress has provided a mechanism for the acquisition of lands for tribal communities that takes account of the interest of others with stakes in the area's governance and well-being." Id. Tribes can ask that the land be taken into trust.
V.
Defendant Snyder has demonstrated that the phrase "held as Indian lands are held" as written in the Michigan Indian Land Claims Settlement Act, does not mean that the land purchased by Bay Mills under the Land Trust funds are subject to a restriction on alienation and are not subject to state authority. The Congress that approved MILCSA understood that Bay Mills can acquire and hold land with many forms of title, including fee simple and the disputed phrase recognizes just that. The lack of procedural protections for the communities affected by the land purchases suggests that Congress did not intend for the Bay Mills to acquire the land subject to tribal authority and with a restriction on alienation. Finally, the lack of explicit preemptive language in MILCSA also supports Defendant's interpretation. While the disputed phrase may have been used in treaties in the early 1800s as a term of art, this Court must interpret MILCSA as the 1997 Congress would have interpreted the phrase. No evidence suggests that Congress used the phrase in 1997 with the same meaning it had in 1800. When the phrase was used in treaties, Congress did not consider the possibility that tribes would make open-market purchases of land. Finally, the Nonintercourse Act does not apply to MILCSA-acquired lands. The Nonintercourse Act restricts alienation of lands with aboriginal or Indian title, something not acquired by open-market purchases.
ORDER
For the reasons provided in the accompanying Opinion, Defendant Rick Snyder's motion for summary judgment (ECF No. 53) is GRANTED.

The United States Supreme Court wrote that the Vanderbilt Parcel is located in Vanderbilt, Michigan. See Bay Mills Indian Cmty. , 134 S.Ct. at 2029. According to the Corwith Township webpage, the incorporated Village of Vanderbilt is located within the boundaries of Corwith Township. http://www.vanderbiltmich.com/corwith.html.

Bay Mills makes this assertion in paragraph 25 of the complaint. Without a citation to the record, the Supreme Court also stated that the Vanderbilt Parcel was purchased using "accrued interest from a federal appropriation." Bay Mills Indian Cmty. , 134 S.Ct. at 2029. At the hearing, Defendant represented that, should the motion be denied, he was prepared to disputed this fact.

The 2010 lawsuit is still pending, but the defendants are now the individual tribal leaders. The parties in the 2010 case entered a stipulation that the lawsuit will be stayed until the Court resolves this motion and all appeals on this motion are exhausted. Michigan v. Gelezen , 1:10-cv-1273 (W.D. Mich. 2010) (ECF No. 223.)

The Court has not considered the other sentence § 107(a)(3), which provides that the "earnings generated by the Land Trust shall be used exclusively for improvements on tribal land or the consolidation and enhancement of tribal landholdings through purchase or exchanged."

Bay Mills does not contend that the Vanderbilt Parcel is part of its reservation or that the land has been taken into trust.

This statute, the Indian Reorganization Act (IRA) was enacted in 1934, was originally placed in Chapter 25 of the U.S. Code beginning in Section 461. The statute has since been transferred and now begins in Section 5101.

Bay Mills argues the Seneca Nation statute is unique because of the facts and circumstances giving rise to the lawsuit and legislation, which are summarized in the statute, 25 U.S.C. § 1774. The Second Circuit's opinion speaks for itself; the panel did not identify any of the reasons offered by Bay Mills as the reason the Seneca Nation statute was unique.

"Indian country" means "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. 18 U.S.C. § 1151.

The treaty ended a war between the United States and multiple Indian tribes, not just the Wyandots. The Court accessed the text of the treaty at http://www.kansasheritage.org/PBP/books/treaties/t_1795.htlm.

This is the opening phrase of the treaty.

Several law review articles have considered whether the Nonintercourse Act applies to open market purchases of land by Tribes. See Mark A. Jarboe and Daniel B. Watts, Can Indian Tribes Sell or Encumber Their Fee Land Without Federal Approval? , 0 American Indian L.J. 10 (2012); Brian Pierson, Resolving A Perilous Uncertainty: The Right of Tribes to Convey Fee Simple Lands , 57 Fed. Law. 49 (March/April 2010).

Citing Alonzo , the Fifth Circuit held that the Fifth Circuit held that "[t]he Nonintercourse Act protects a tribe's interest in land whether that interest is based on aboriginal right, purchase, or transfer from a state." Tonkawa Tribe of Oklahoma v. Richards , 75 F.3d 1039, 1046 (5th Cir. 1996). But, the portion of that sentence that discusses a purchase is dictum. The lawsuit did not involve the purchase of land by an Indian tribe and the lawsuit was dismissed because the Tonkawas never had a vested interest in the land based on the 1866 act passed by the Texas provisional government. Id. at 1042, 1046-67.
The dispute in Alonzo concerned more than 75,000 acres of land held by the Pueblo Indians, the Paguate Grant. Alonzo , 249 F.2d at 191. Also included in the dispute was acreage that was part of three purchases of land, two of which courts had previously resolved the title in favor of the tribes. Id. at 192. Thus, the only title dispute concerning a purchase was over 480 acres the Pueblos acquired from the Baca family. Id. 192-93. The court likely recognized the weakness of its conclusion that the Nonintercourse Act extended to the purchased land, for in the next paragraph the court identified different federal statutory authority, which was unique to the Pueblos, and which impose restriction on all Pueblo land. Id. at 196 ; See United States v. State of Michigan , 882 F.Supp. 659, 675 (E.D. Mich. 1995).