NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0616n.06

Nos. 18-2259/2302

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BAY MILLS INDIAN COMMUNITY, | ) | **FILED** |
| | ) | Dec 13, 2019 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| GRETCHEN WHITMER, Governor, in her official | ) | COURT FOR THE WESTERN |
| capacity, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

Before: COLE, Chief Judge; MERRITT and LARSEN, Circuit Judges.

PER CURIAM. Bay Mills Indian Community and the Governor of the State of Michigan are entangled in a long-standing dispute over whether Bay Mills can operate a casino on a parcel of land in Vanderbilt, Michigan. The district court granted summary judgment in the Governor's favor. For the reasons stated, we VACATE the district court's summary judgment order and REMAND for further proceedings.

## I.

Bay Mills seeks to operate a casino on a parcel of land in Vanderbilt, Michigan, located in Michigan's Lower Peninsula, roughly 125 miles south of Bay Mills' reservation in the Upper Peninsula.[1] Bay Mills says that it purchased the Vanderbilt parcel with earnings from a Land Trust established by Congress for Bay Mills in § 107(a) of the Michigan Indian Land Claims Settlement

---

[1] For a more detailed discussion of the facts and procedural history, see the Supreme Court's decision in *Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014).

Act (MILCSA), Pub. L. No. 105-143, 111 Stat. 2652, 2658 (1997). Bay Mills believes it should

be allowed to operate a casino on the parcel pursuant to the Indian Gaming Regulatory Act (IGRA),

25 U.S.C. § 2701 *et seq.* IGRA allows tribes to operate casinos on "Indian lands." *Id.* § 2710.

IGRA defines "Indian lands" to include land that is "held by any Indian tribe . . . subject to

restriction by the United States against alienation and over which an Indian tribe exercises

governmental power." *Id.* § 2703(4)(B).

Bay Mills' argument that the parcel constitutes "Indian lands" under IGRA relies, in part,

on the meaning of § 107(a)(3) of MILCSA, which provides:

> The earnings generated by the Land Trust shall be used exclusively for improvements on tribal land or the consolidation and enhancement of tribal landholdings through purchase or exchange. Any land acquired with funds from the Land Trust shall be held as Indian lands are held.

Bay Mills claims that land it acquires pursuant to this provision of MILCSA satisfies the definition

of "Indian lands" outlined in IGRA and is therefore eligible for casino gaming.

To facilitate a speedy and efficient resolution of the issues in this case, the parties stipulated

to submit individual issues to the district court, the first being the proper interpretation of the

second sentence of § 107(a)(3), specifically the phrase "held as Indian lands are held." If Bay

Mills could prove that the phrase "held as Indian lands are held" meant that land acquired with

Land Trust funds automatically obtained special status (such as restricted fee status), the parties

would proceed to litigate further issues. *See Bay Mills Indian Cmty. v. Snyder*, 372 F. Supp. 3d

570, 574 n.2 (W.D. Mich. 2018). But if, as the Governor argued, land acquired with Land Trust

funds obtained no special status, the case would be over. The district court sided with the Governor

and granted the Governor's motion for summary judgment. *Id.* at 587.

II.

Just as they did before the district court, the parties ask us to interpret the second sentence of § 107(a)(3) in a vacuum. First, they ask us to ignore an apparent factual dispute. In her briefing, the Governor says that among the questions to be litigated in the future—if Bay Mills prevails in this appeal—is whether the Vanderbilt parcel was purchased using funds from the Land Trust. But the parties' stipulation put the district court in the position of opining on the parties' chosen legal question without assessing whether there remained a "genuine dispute" of "material fact" regarding this issue. *See* Fed. R. Civ. P. 56(a). "Courts should avoid passing on questions of public law . . . that are not immediately pressing," and "an advisory opinion" describing what the law would be based on hypothetical facts "cannot be extracted from a federal court by agreement of the parties." *Barr v. Matteo*, 355 U.S. 171, 172 (1957) (internal quotation marks and citation omitted); *see also Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241 (1937). If the Vanderbilt parcel was purchased using other funds, the district court would not need to reach the question of how to interpret § 107(a)(3).

Because this factual question was not litigated below, the record on appeal does not present sufficient information for us to determine whether the dispute is both "material" and "genuine." *See, e.g.*, *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) (explaining that not every alleged factual dispute meets this criteria). On remand, the district court should consider this question in the first instance.

Second, the parties tell us to focus only on the phrase "held as Indian lands are held" and disregard what that phrase means in the broader context of § 107(a)(3) and MILCSA as a whole. We are not inclined, however, to allow the parties' stipulation to constrain our ability to interpret § 107(a)(3) according to ordinary rules of statutory interpretation. "[S]tatutory language cannot

be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809 (1989). We do not read statutes one phrase at a time, ignoring the rest. Instead, the best reading of one statutory phrase is often determined by context—by the words Congress uses before, or after, a particular phrase. *See id.*

Section 107(a)(3) contains two sentences. The first identifies the land eligible for purchase with MILCSA funds, and the second (which we are asked to review here) describes the nature of Bay Mills' title in that land. It is not difficult to see a possible relationship between the two provisions. For example, if the first sentence of § 107(a)(3) only allows Bay Mills to purchase land near its existing reservation (a question the parties have reserved for future litigation), that might indicate that Congress had such land in mind when crafting MILCSA's second sentence— a fact that could make it more likely that Congress intended for Bay Mills to exercise sovereignty over land acquired through MILCSA. By contrast, if the first sentence of § 107(a)(3) allows Bay Mills to purchase land anywhere in the United States, the notion that Congress intended Bay Mills to assert tribal governance and jurisdiction over that land might seem less plausible.

Indeed, the parties' arguments are imbued with the tension caused by their agreement to read the second sentence of § 107(a)(3) in isolation. The Governor asks us to consider the implications of reading "held as Indian lands are held" to automatically bring any lands purchased with MILCSA funds under IGRA. That would mean, the Governor says, that Bay Mills could buy a piece of property anywhere in the United States and run a casino, heedless of any state law or local ordinances. Bay Mills responds, in part, by saying that whether the Governor's "parade of horribles" will ever materialize will depend on the results of future litigation, which will tell us

what lands are subject to purchase with funds from MILCSA's Land Trust.[2]  For its part, the Governor's position presents its own "horrible" for us to consider—affirming the district court's holding might mean that even if Bay Mills were to acquire, with MILCSA funds, land immediately adjacent to its existing reservation, those lands would not be subject to Bay Mills' governance (and thus would also be ineligible for the operation of a casino under IGRA).  But these scenarios, which occupied a great deal of the parties' attention during briefing and argument, may never materialize, if the first sentence of § 107(a)(3) contains some type of geographic (or other) restriction on the use of MILCSA funds.

All of this is merely illustrative of the possible relationship between the two sentences of § 107(a)(3).  We do not intend to suggest a proper understanding of either sentence, or of the two when read together.  The point is—it was improper for the parties to attempt to artificially constrain our ability to read the statute as a whole, and to force consideration of the statutory phrase "held as Indian lands are held" in a vacuum.  While it is surely true that Congress often "legislates by parts—addressing one thing without examining all others that might merit comparable treatment," *Bay Mills Indian Cmty.*, 572 U.S. at 794, we are not free to interpret Congress's work in parts— addressing in isolation a single phrase that Congress wrote as part of a cohesive statutory scheme. Because that is what the parties' stipulation forced the district court to do, we vacate the district court's order granting summary judgment to the Governor.

In sum, we remand for the district court to consider whether the parties' apparent factual disagreement regarding the funds used to purchase the Vanderbilt parcel is a "genuine dispute" of "material fact" that precludes summary judgment.  Fed. R. Civ. P. 56(a).  If it is not, and a party

---

[2] The Tribe conceded at oral argument that the first sentence of § 107(a)(3) contains some "geographic limitation," though its boundaries remain to be determined.

"is entitled to judgment as a matter of law," the district court should consider the proper interpretation of § 107(a)(3) as a whole and in context. *Id.* We emphasize, however, that we express no present view on the proper interpretation of § 107(a)(3).

III.

Our review of the record raises other concerns, stemming from Bay Mills' involvement with the National Indian Gaming Commission (NIGC). There is little evidence in the record regarding the proceedings before the NIGC. What we do know is that in early 2010, Bay Mills applied to the NIGC to amend its gaming ordinance to include the Vanderbilt casino. Bay Mills appears to have filed two such applications, one on February 25, 2010, and one on May 26, 2010. The May 26, 2010 application includes a lengthy memorandum setting forth in detail Bay Mills' legal position on why the NIGC should treat the Vanderbilt parcel as "Indian lands" and approve the Vanderbilt casino under IGRA. It appears, however, that Bay Mills withdrew these applications before the NIGC could respond.[3]

Despite withdrawing the applications, Bay Mills nonetheless opened the Vanderbilt casino on November 3, 2010. This prompted the NIGC to investigate the casino; as part of that investigation, it sought the position of the Department of the Interior as to whether the Vanderbilt parcel constituted "Indian lands." The Solicitor of the Interior responded with an opinion concluding that the parcel did not constitute "Indian lands." Based on that document, the NIGC Associate General Counsel sent a memorandum to the NIGC Chairwoman, explaining that, because the Vanderbilt parcel did not constitute "Indian lands," the NIGC did not have jurisdiction over the casino. Because the casino was possibly operating contrary to federal and state law, the

---

[3] In addition, Bay Mills had previously requested the opinion of the Department of the Interior as to whether the Vanderbilt parcel constituted "Indian lands." But it appears that Bay Mills also withdrew this request before the Department could respond.

General Counsel recommended that the NIGC alert the appropriate law enforcement authorities. The NIGC did so, via a letter to the Michigan Governor, Michigan Attorney General, and the United States Attorney for the Eastern District of Michigan. Bay Mills' President and Tribal Attorney were copied on this letter. The State of Michigan filed suit against Bay Mills that same day.[4]

Despite being on notice of the NIGC's position, Bay Mills later sent gaming facility licenses for the Vanderbilt casino to the NIGC in 2012 and 2016. Both times the NIGC responded by letter, restating its earlier position that it lacked jurisdiction over the casino and declining to accept the licenses.

These proceedings leave us with several questions. What was the effect, if any, of Bay Mills' withdrawal of its applications to amend its gaming ordinances before the NIGC could respond? Was there ever a final decision by the NIGC on Bay Mills' application for an amendment to the gaming ordinance that Bay Mills could have appealed? *See* 25 U.S.C. § 2714; 25 C.F.R. §§ 582.2, 582.7. Or was there some other action that would constitute "final agency action" from which Bay Mills could have appealed? *See, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016); *see also, e.g.*, *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019). If Bay Mills could have appealed a decision of the NIGC, is there now any preclusive effect from the failure to do so? If Bay Mills is not precluded from litigating the question whether the Vanderbilt parcel constitutes "Indian land," is the NIGC (or any other federal entity) an indispensable party to this litigation, given that it has repeatedly declined to exercise

---

[4] The State of Michigan's suit against Bay Mills is a separate case from the present one. Here, Bay Mills is the plaintiff who has sued the Governor of Michigan in her official capacity. In the earlier suit, the Supreme Court ultimately ruled that tribal sovereign immunity "protect[ed] Bay Mills from th[e] legal action." *Bay Mills Indian Cmty.*, 572 U.S. at 785.

jurisdiction over the parcel on the ground that, in the NIGC's view, it does not constitute "Indian land"? Fed. R. Civ. P. (19)(a); *cf. Boles v. Greeneville Hous. Auth.*, 468 F.2d 476, 479 (6th Cir. 1972) ("In order to grant the relief sought by the appellants this court would be compelled to hold in effect that not only did [the Department of Housing and Urban Development] misinterpret its own guidelines, but that it also misconceived its function and prerogatives under the Urban Renewal Act.").

We may raise preclusion questions *sua sponte*. *See Arizona v. California*, 530 U.S. 392, 412–13 (2000) (recognizing that raising a preclusion issue *sua sponte* "might be appropriate in special circumstances"); *see also Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 552 n.9 (6th Cir. 2012). The same is true for the questions regarding whether the NIGC is an indispensable party. *See Boles*, 468 F.2d at 479 n.4 ("We do not hesitate to raise the indispensable party question on our motion."); *see also* 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1609 (3d ed. 1998) ("[B]oth the trial court and the appellate court may take note of the nonjoinder of an indispensable party sua sponte."). But here, where the record provides little information on the proceedings before the NIGC and a remand to the district court is already necessary for other reasons, we believe it appropriate to leave it to the district court on remand to consider the effect of the NIGC proceedings.

\* \* \*

We VACATE the district court's order granting summary judgment to the Governor and REMAND for further proceedings.